[Civ. No. 2955.    Third Appellate District.—December 19, 1925.]

SILVA–BERGTHOLDT COMPANY (a Corporation), Respondent, v. THE J. H. FLICKINGER CO. (a Corporation), Appellant.

[1] SALES—CONTRACT FOR SALE OF PEARS—AGREED PURCHASE PRICE—EVIDENCE—FINDINGS.—In this action to recover the amount due under a contract for the sale of certain pears, the finding of the trial court that the agreed purchase price of said pears included an amount fixed by the pear growers' association as a service charge to members of the association was not supported by the evidence, where it appears from the evidence that the pears were released and sold by plaintiff directly to defendant without the rendition of any service relative thereto by the association.

[2] ID.—WEIGHT OF PEARS—EVIDENCE—FINDINGS—APPEAL.—In such action, although the evidence is conflicting as to the total weight of the pears delivered, there is ample evidence to support the finding of the trial court in favor of plaintiff upon that issue and that finding cannot be disturbed on appeal.

[3] ID.—FREIGHT—CREDIT FOR.—In such action, the trial court prop-
erly allowed the defendant credit for an amount paid as freight
on the defective pears, because that expense was incurred before
defendant was required to inspect the fruit.

(1) 35 Cyc., p. 108, n. 24 New.    (2) 35 Cyc., p. 233, n. 5 New.
(3) 35 Cyc., p. 573, n. 76.

APPEAL from a judgment of the Superior Court of
Placer County.   J. B. Landis, Judge.   Affirmed as modified.

The facts are stated in the opinion of the court.

Bohnett, Hill & Campbell for Appellant.

Raglan Tuttle for Respondent.

FINCH, P. J.—The defendant has appealed from the
judgment of the trial court herein in favor of the plaintiff.

The complaint alleges that the plaintiff sold the pears
growing upon its lands in the year 1923 to the defendant
at the agreed price of twenty-five per cent "over season's
opening price of the Pear Growers Association"; that
"the Pear Growers Association's opening price for the
season of 1923 was $50 per ton for said pears, plus $2.50
a ton service charge"; and that plaintiff delivered to de-
fendant sixty-five and a half tons of pears; that the total
purchase price of such pears was the sum of $4,263.68, of
which only $3,174.61 had been paid.   The prayer is for
judgment in the sum of $1,089.07.

The answer admits the contract and the opening price
of $50 a ton, but denies that the service charge of $2.50
a ton fixed by the association is applicable to the contract
of the parties to this action, and alleges that only 129,206
pounds of pears were delivered; that, of such quantity,
20,460 pounds "were wormy, or otherwise defective, were
not according to contract, were not fit for use, and could
not be, and were not used, by defendant"; that "de-
fendant incurred expense, by way of freight and labor upon
said defective pears . . . in the sum of" $248.72; that
defendant deducted from the purchase price of the pears
the sum of $36.99 for the rental of fruit-boxes to the
plaintiff; and that the defendant has overpaid plaintiff

$100.76. Defendant filed a cross-complaint for the recovery from plaintiff of the said sum of $100.76.

The court found that "the Pear Growers Association's opening price for the season of 1923 was $50 per ton for said pears, plus $2.50 a ton service charge"; that plaintiff delivered to defendant sixty-five and a half tons of pears; that the total purchase price thereof was $4,257.50; that the pears, upon their arrival at defendant's cannery, were by defendant "inspected, examined, accepted and weighed"; that "the presence of worms in said pears and the wormy condition of the same, could, at the time of the delivery of the same and at the time when they were examined and accepted by defendant, have been detected and discovered by an inspection and examination of said pears"; that at the time of such delivery three and a half tons of the pears were "wormy and unfit for canning purposes" and that the defendant is entitled to credit therefor at the purchase price thereof; that the remainder of the pears were "in accordance with the terms of the contract"; that the defendant paid out freight on the wormy pears in the sum of $17.09 and is entitled to credit for that sum; that it paid out for labor upon the wormy pears the sum of $77.21, but is not entitled to credit therefor; and that it is entitled to credit for $36.99 for rental of lug-boxes. Judgment was entered in favor of the plaintiff for $801.31.

[1] The plaintiff is a member of the California Pear Growers Association. It appears that members are under contract to market their fruit through the association, but that it may release specified fruit of a member, in which case he may sell direct to the buyer. A witness, who was assistant secretary of the association, testified that a service charge of five per cent is made on the selling price of fruit marketed through the association; that all members of the association and all canneries were notified of the opening prices of 1923; that "the price to the members is fifty dollars net. That is the price that the members get. The association gets the two dollars and fifty cents. The original notification to the members would have exactly the same thing, fifty dollars. The notification to the canneries carries the fifty-two dollars and fifty cents notification. . . . The members know there is a charge of

five per cent. . . . There is no sale by a member to a cannery only on the special grade and special price. . . . The Pear Growers agreement calls for a release for eastern shipment, or release to special cannery at a special grade and a special price." The pears involved in this suit were released by the association and the plaintiff made the sale thereof directly to the defendant "without the interposition of the Pear Growers Association, or any of its agents." Plaintiff notified the association that the sale had been made, but the association had no "communication with the Flickinger Company relative to these pears." Another witness, who was secretary and manager of the plaintiff and also a director of the association, testified: "The season's opening price of the Pear Growers Association was later established, subsequent to the date of the contract, as fifty dollars per ton, plus a service charge of two dollars and fifty cents per ton, F. O. B. point of shipment." This testimony is substantially in the language of the complaint and of the findings. Since the sum of $2.50 mentioned in the resolution of the association establishing the opening price of pears for the season of 1923 is designated as a service charge, which the evidence shows goes to the association where pears are marketed through it, and since the pears here in question were released and sold by the plaintiff directly to the defendant without the rendition of any service relative thereto by the association, it does not appear upon what theory it can be held that such service charge is a part of the "season's opening price of the Pear Growers Association." In respondent's brief it is said: "As a member of the association, respondent was compelled to pay over this $2.50 a ton to said association." There is no evidence, however, to support this assertion. The opening price of "$50 per ton, plus $2.50 service charges" was fixed as the price of pears which were not released and had no application to such pears as were released from the pooling agreement. It cannot be presumed, in the absence of evidence upon the question, that members were required to pay the association a service charge upon the sale of pears which had been released and with which sale the association had nothing to do. The appellant, therefore, is entitled

to have the sum of $155 deducted from the amount of the judgment.

[2] The evidence is conflicting as to the total weight of the pears delivered, but since there is ample evidence to support the court's finding in favor of plaintiff upon that issue the finding cannot be disturbed.

The defendant introduced evidence sufficient to support a finding that 20,460 pounds of the pears were defective and unfit for canning and were a total loss. Such evidence was to the effect that the defective condition of the pears could be discovered only by cutting them in half and hence was not discovered until they were in process of preparation for canning. A few of the defective pears were spotted, but "most of them were wormy." Plaintiff introduced evidence to the effect that the pears were carefully inspected before shipment and the defective ones thrown out, that the presence of worms in pears may be readily detected by inspection, and that those shipped were in good condition and free from worms. Shipments were made July 31st and August 1st, 2d, 4th, and 6th. Defendant's superintendent inspected the pears upon their arrival at the cannery. He testified that he "gave them the regular inspection"; that "the pears themselves looked very good, and as we had always had satisfactory pears from Mr. Bergtholdt, I did not really search for wormy holes in the stem end"; that he was "not sure" that he could have detected the evidence of the worms by "the right kind of search"; that "you have to make a pretty close inspection" to detect them. Four carloads of the pears were stacked in the ripening shed and one was placed in cold storage. As the pears in the shed ripened they were sorted from day to day and the riper ones were weighed and taken into the cannery. On some days all or a part of those taken to the cannery were not packed immediately, but were held over until the following day. Defendant's records show that from the seventh to the eighteenth days of August the pears which had been placed in the ripening shed were taken into the cannery as follows: 7th, 1,153 pounds; 8th, 2,649; 9th, 8,688; 10th, 6,687; 13th, 11,547; 14th, 16,266; 15th, 16,224; 16th, 19,070; 17th, 7,541; 18th, 4,236. Defendant's superintendent testified that a few worms were discovered in the pears on the 7th, but that

no record was kept of the weight of the wormy pears prior to the 13th "because we did not think there would be very many." Commencing with the 13th, defendant's records show the weights of defective pears as follows: 13th, 404; 14th, 697; 15th, 1,695; 16th, 2,874; 17th, 1,082; 18th, 5,988; 20th, 365. The record for September 4th and 5th shows that the pears which had been placed in cold storage, weighing 22,055 pounds, were taken to the cannery and that 3,469 pounds of them were unfit for canning and were thrown out. On the 8th of August the defendant wired plaintiff that there was "quite a large proportion of wormy pears," and on the 13th wrote to the same effect. Plaintiff thereupon sent one of its foremen to investigate the matter. The foreman testified that he arrived at defendant's cannery on the 15th; that he there looked at the pears in several lug-boxes and that they "did not show the sign of worms," but that he saw worms in some pears "they said were our pears out in the wastage department. They figured up the percentage up to the date I had been there; it ran between five and seven per cent."

The court found that three and a half tons, or about five and one-third per cent, of the pears were defective. Appellant contends that there is no contradiction of the evidence produced by defendant to the effect that 20,460 pounds of the pears were defective. The court, however, was not bound to accept those figures. At the time plaintiff's foreman visited the cannery nearly half of the pears had been weighed and taken into it. If the defective pears then "ran between five and seven per cent" it would not be unreasonable to infer that the remainder would probably run in about the same proportion. No satisfactory explanation was given of the steady increase in the percentage of defective pears from August 7th to September 5th. The court may have believed, and reasonably so from the evidence, that pears which were fifteen per cent wormy could not pass the inspection of experienced fruit-men.

[3] The court properly allowed the defendant credit for the amount paid as freight on the defective pears, because that expense was incurred before defendant was required to inspect the fruit. The court found, on sufficient evidence, that the presence of worms in the pears

could have been "detected and discovered by an inspection and examination" thereof at the time of delivery and refused to allow the defendant credit for expense and labor thereafter incurred in peeling the three and a half tons of defective pears for canning. If, as the court found, an inspection of the pears would have disclosed their wormy condition, no reason appears for thereafter incurring expense in preparing them for canning. Appellant relies on a provision of the contract between the parties that the "buyer may reject . . . any delivery, containing fruit . . . not complying with specifications . . . and may charge the same and all costs, freight or expenses paid or incurred in connection with the delivery thereof back to seller and deduct such amounts from any amount due to seller." It is a sufficient answer to say that the expense of peeling the pears for canning is not an expense "paid or incurred in connection with the delivery" thereof.

The judgment is modified by deducting from the amount thereof the sum of $155, and as so modified it is affirmed, appellant to recover costs of appeal.

Plummer, J., and Hart, J., concurred.